Filed 5/6/21  In re S.E. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.E., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DANIEL E., <br><br> Defendant and Appellant. | F081742 <br><br> (Super. Ct. No. 19JD0009) <br><br> **OPINION** |

### THE COURT[*]

APPEAL from orders of the Superior Court of Kings County.  Jennifer Lee Giuliani, Judge.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Lee Burdick, County Counsel, and Rise A. Donlon, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P.J., Smith, J. and Snauffer, J.

Daniel E. (appellant) challenges the juvenile court orders removing his daughter, S.E., from his custody and terminating his parental rights. Appellant contends he received ineffective assistance of counsel during the Welfare and Institutions Code sections 387, 388, and 366.26 hearings.[1] We find no prejudicial error and affirm.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

On January 7, 2019, the Kings County Human Services Agency (agency) filed a section 300 petition alleging that appellant, stepfather to M.C. and T.C. and father to S.E., had physically abused M.C., then age 12, by choking, pushing, and slapping the child in the face, and sexually abusing her previously while they lived in Missouri and more recently in December of 2018, when they lived in California. The petition alleged that mother knew of the abuse and failed to protect the child.[2] The petition also alleged that appellant and mother were engaged in domestic violence while the children were present, and that all the children were at substantial risk of similar abuse and neglect.

*Detention*

The report prepared for the detention hearing stated that the children had been placed with a relative and recommended that the children remain out of the home.

The social worker interviewed mother, as well as the two older children. S.E. was two and one-half years old and too young to be interviewed. T.C., then age 10, reported that he felt safe in the house and that they all got along. M.C. reported that appellant touched her breasts when she was in Missouri and she did not feel safe around him. She reported that appellant was mean to her, yelled at her, took her bedroom door off the hinges, and hit and punched her.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] Mother is not a party to this appeal, and M.C. and T.C., whose father is deceased, are not subjects of this appeal. We address the facts and history of the dependency case primarily as it relates to appellant and his child, S.E. The dependency of M.C. and T.C. and mother's role are discussed to give context to the issues surrounding appellant.

Mother reported that both she and appellant disciplined the children by taking away privileges before "they use the belt."

At the detention hearing on January 8, 2019, both appellant and mother were present. The parties submitted on the issue of detention and the juvenile court found appellant to be the presumed father of S.E. A jurisdiction and disposition hearing was set for January 30, 2019.

*Jurisdiction/Disposition*

The report and two addendum reports filed for the jurisdiction and disposition hearing recommended that the children remain out of the home and that appellant and mother receive reunification services. Information was requested regarding any prior child protective services involvement in Missouri, but nothing had yet been verified.

In an interview, M.C. described being sexually touched by appellant in Missouri and more recently in California. She described appellant as taking the door to her bedroom off the hinges so he could "mess with me more," that he was coming in and out of her bedroom and tried to lie on her bed with her multiple times. She tried to rebuff his advances, but the third time, he put his hand over her mouth while she tried to yell for her mother. The fourth time he came into her room, he was waiving around a knife and told her he had a way to make her disappear.

M.C. recalled that the first time appellant came into her room and touched her was in Missouri when she was eight years old. She thought his behavior would stop when they moved to California. About a month prior to this interview, appellant had threatened to choke M.C. if she did not do what he told her to do. At the time, M.C. thought appellant was going to rape her. He laid on the bed with her, wrapped his legs around her, and moved his hips on her back, thrusting his penis against her while his arms were wrapped around her chest. M.C. described another similar assault, this time she said "no", and appellant got angry and choked her. M.C. told her mother, her cousin, and her aunt about these events. M.C. also told her grandmother, but then denied it happened

3.

because she was worried that she was hurting her family and was concerned about possible consequences.

M.C. stated that she often got into trouble at home. In December of 2018, appellant smacked her in the face, pushed her on the bed, and hit her all over her body. M.C. had witnessed domestic violence in the home and feared what appellant could do.

When asked if there were any additional incidents, M.C. alluded to something that happened with her "crotch," but asked to stop the interview because she was uncomfortable continuing the conversation.

T.C. reported an incident which occurred a week prior in which appellant and mother were arguing about whether M.C. could get a hot dog from the refrigerator. Mother had given her permission to do so, but appellant argued with mother and hit her with his fist while she tried to get away. Appellant tripped mother, causing her to almost hit her head on a table. Mother hit appellant in the face, and appellant continued to hit mother. T.C. was in the doorway of his room, witnessing the argument, and was worried that mother would get hurt. He had witnessed other incidents as well.

T.C. reported that appellant did not like M.C. and T.C. was scared for his sister. During an incident in Missouri, appellant was drunk and pushed T.C. down. When he reported this to mother, appellant apologized.

Mother acknowledged that appellant took the door off M.C.'s bedroom and was extreme at time in his discipline techniques. Mother acknowledged domestic violence in the home but denied that anything similar to the fight T.C. described had happened in about a year.

Both M.C. and T.C. reported that they did not want to return home to appellant.

Appellant was interviewed and reported a lot of domestic violence in the home he grew up in. While he denied any current drug use, he had experimented with methamphetamine and marijuana when he was younger. He acknowledged an alcohol problem but stated he had been sober since July of 2016.

4.

Appellant denied sexually abusing M.C., but he had a criminal case pending. He did acknowledge demonstrating a choke hold on her and having a knife in her room, which he claimed was because he was peeling an orange. Appellant described M.C. as sexual, and intimated that she had multiple boyfriends and engaged in sexual acts. According to appellant, M.C.'s abuse of a younger sibling led to the previous allegations in Missouri.[3]

At the contested hearing held February 7, 2019, appellant and mother submitted on the issue of jurisdiction. Counsel for appellant submitted a waiver of rights form, signed February 4, 2019. The juvenile court questioned appellant about the form, and appellant stated he had read it, understood it, and had gone over it with counsel.

The contested hearing proceeded by argument on the issue of disposition, in which appellant and mother argued that the two younger children would be safe in the home, especially because paternal grandmother would be living with them. Counsel for the minors and for the agency both argued that the children would be at risk of harm and that having grandmother in the home did not resolve the issue of safety.

The juvenile court found the petition true, took jurisdiction, and found by clear and convincing evidence that the children should be out of the home. Reunification services and supervised visits were ordered for both appellant and mother. Appellant was ordered to complete a mental health assessment and follow recommendations of the therapist, to attend parenting classes, to enroll and engage in a domestic violence program, and to enroll and complete an offender sexual abuse class and follow the recommendations of the therapist.

The parties were advised of the right to appeal and a six-month review hearing was set for August 1, 2019.

---

[3]     Documents from Missouri showed a restraining order protecting a sibling of M.C.'s from M.C. based on sexual acting out that occurred in December 2015.

*Interim Review Hearing*

By July of 2019, mother and father were living separately. At a July 11, 2019, interim review hearing, the juvenile court authorized a 30-day trial visit with appellant and mother, each for a half month separately with S.E., as both had made substantial progress in their case plan. Appellant was said to be attending individual therapy with Eric Douglas and attending an offender's program with Tim Zavala "to address sexual abuse." Appellant completed a parenting class.

*Six-Month Review Hearing*

The report prepared for the six-month review hearing recommended that M.C. and T.C. be returned to mother and S.E. be returned to appellant and mother with S.E. spending equal time with each parent separately. The agency reported that appellant was making substantial progress in his case plan. He was engaged in individual therapy addressing anger management and domestic violence and, according to the clinician, Douglas, "demonstrated behavioral change" and did not blame others for his actions. According to Douglas, appellant "does not display any signs of a sexual perpetrator." In March of 2019, appellant completed an offender sexual abuse assessment with psychologist Rodolfo Borrego, who did not recommend appellant for additional services because appellant did not "acknowledge or accept responsibility for the sexual abuse allegations." The report stated that appellant completed an assessment with Zavala in May of 2019, where it was determined that appellant would benefit from the offenders program. A month later, the social worker spoke to Zavala, who reported that appellant was "able to identify the abuse occurred" and "demonstrate his protective capacities to prevent … further abuse to occur."

At the August 1, 2019, review hearing, the juvenile court ordered M.C. and T.C. returned to mother and S.E. returned to appellant and mother on alternate weeks with family maintenance services. The exchange of S.E. was to take place at the police station. A 12-month review was set for January 24, 2020.

## *Interim Hearing*

On September 19, 2019, the parties were back before the juvenile court because appellant and mother had not complied with the court's orders involving the weekly exchange of S.E. M.C., who was taken to the emergency room after cutting herself, expressed a fear of what would happen to S.E. in appellant's care. M.C. also expressed concern that appellant and mother would reconcile as a couple, and that, rather than making the exchange at a police station, appellant had been dropping S.E. off at mother's, where M.C. resided.

At the interim review hearing, the juvenile court admonished appellant and mother and reiterated the order that the weekly exchange of S.E. was to take place at the police station.

## *Section 387 Petition and Detention of S.E. as to Appellant*

On October 15, 2019, the agency filed a section 387 supplemental petition alleging S.E. was at risk of harm. On September 9, 2019, the agency had attempted to make an in-home contact with appellant, who refused to allow the social workers into his home. On October 4, 2019, appellant refused to schedule an in-home contact with the social worker and stated he was unsure of when the agency would be able to see S.E. in his care. Appellant suggested an in-home contact for October 11, 2019, at a time that was outside the agency core operating hours.

On October 10, 2019, prior to the requested in-home contact, M.C. reported additional details of appellant sexually abusing her, beginning when she was seven or eight years old and continuing until 2018. M.C. relayed that appellant had made threats against her and the family if she told anyone of the abuse. She described being suicidal when she was younger and appellant telling her he would help her commit suicide. She also described appellant rubbing her vagina, inserting his finger into her vagina, and penetrating her anally. She reported an incident when she blacked out when he came into her room and she awoke without pants on and a dried residue on the leg of her pants.

7.

M.C. stated that, after she disclosed this to her mother and grandmother, her mother told appellant, and he cut M.C. with a knife on her arm. M.C. expressed concern for S.E. in appellant's care, as she was unable to talk and defend herself and he allowed her to "run around naked in the house."

The agency contacted mother on October 14, 2019 and advised her that none of the children were to have contact with appellant, and that she should contact law enforcement if he attempted to do so. Mother described the allegations as "bullshit" and she did not know or want to comment on whether they were true, as she did not want the children removed from her care.

A detention hearing was held October 16, 2019, and the juvenile court found that a prima facie showing had been made that the prior disposition for S.E. had been ineffective in protecting her, removed her from appellant's care, but allowed her to remain in mother's care. Jurisdiction and disposition were set for November 6, 2019.

*Section 387 Petition and Detention for Mother*

That same day, October 16, 2019, the agency filed a section 387 supplemental petition alleging that the previous disposition as to M.C., T.C. and S.E. had not been effective and detained the children from mother's care.

As a result of the additional information received from M.C. regarding sexual abuse by appellant, appellant was arrested on four forceable sexual assaults: sodomy (Pen. Code, § 286, subd. (b)(2)), assault with an object (Pen. Code, § 288.5, subd. (a)), rape (Pen. Code, § 288, subd. (b)(1)), and fondling (Pen. Code, § 288, subd. (b)(1)). Mother signed the bail documents to have appellant released from custody and continued to be in contact with him. Mother stated that she did not want M.C. in her home, and M.C. was fearful to return to mother's home. M.C. reported that mother called her a liar and told her she was getting an innocent man into trouble.

At the contested hearing on October 21, 2019, M.C., T.C., and S.E. were detained from mother. The jurisdiction and disposition hearing was set for November 12, 2019.

*Section 387 Jurisdiction and Disposition Hearing for Appellant and Mother*

The jurisdiction and disposition reports filed by the agency repeated and expanded on many of the sexual assaults by appellant reported by M.C. and mother's refusal to believe her. The agency recommended that reunification services not be offered appellant and mother under section 361.5, subdivision (a)(1)(B), as the time for provision of services as to S.E. had run out.

At the combined jurisdiction and disposition hearing for appellant and S.E. and mother and all three children on November 12, 2019, both mother and appellant requested a contested hearing, which was rescheduled and eventually held January 29, 2020.

The agency filed an addendum report on January 28, 2020, in which it reported that S.E.'s counselor reported inappropriate comments by appellant to S.E., that appellant was not allowing S.E. to speak, and that appellant's concern about mother was greater than his concern for S.E. The counselor was worried that appellant was trying to put thoughts into S.E.'s mind and control the situation. Attached to the addendum report were documents from social services in Missouri, in which appellant's family and mother's family all had concerns about appellant.

The contested jurisdiction and disposition hearing was held January 29 and 30, 2020. Appellant testified and denied that sexual abuse had occurred in the home. He acknowledged that he took M.C.'s door off her bedroom and was unconcerned about her lack of privacy. Appellant moved in with mother in 2014. According to appellant, after mother informed him in 2018 that M.C. made allegations of sexual abuse against him, he was never alone with her to avoid any further allegation. He also testified that he was never contacted by law enforcement or CPS about those allegations.

Mother testified and denied appellant physically abused M.C., and she did not know if sexual abuse had occurred or if she believed M.C. but acknowledged domestic violence with appellant. Mother also testified that she did not believe M.C. regarding the

9.

sexual abuse allegations made against appellant, no agencies were contacted to investigate, and both M.C. and appellant were in the home, although mother did not allow appellant to be alone with M.C.

Maternal grandmother testified that M.C. had disclosed to her that appellant had sodomized her. When she told M.C. that she needed to be seen by a doctor, M.C. became extremely upset and stated she had made it up.

The juvenile court found the section 387 petitions true and found, by clear and convincing evidence, that continuing S.E. in appellant's home put the child at substantial risk of harm. It found the same as to mother and M.C., T.C. and S.E. Reunification services were not offered appellant or mother. The section 366.26 hearing was set for May 21, 2020.

### Section 388 Petition

On May 1, 2020, appellant filed a section 388 petition requesting reunification services. The petition included a letter from appellant's counselor Zavala, stating that appellant had always denied any inappropriate sexual contact with M.C. and that no formal charges on the "initial allegations" had ever been filed against appellant. The juvenile court summarily denied the request.

### Section 366.26 Hearing Reports

A May 8, 2020, agency report filed for the section 366.26 hearing stated that the children were adoptable, but that more time was needed to assess the most appropriate permanent plan for the children. The report detailed behavioral and placement issues with M.C. and T.C. and, as to S.E., stated that she was adoptable, had no significant medical or developmental concerns, and the concerns that did exist were being addressed through mental health services.

Prior to the hearing, which was continued to August 20, 2020, the agency filed an addendum report and assessed that the children were adoptable, and a permanent plan of adoption was in the children's best interests. The agency recommended that mother and

10.

appellant's parental rights be terminated, and the juvenile court order a plan of adoption. Maternal relatives expressed interest in adopting all three children but were pending completion of assessments through the Interstate Compact for the Placement of Children. M.C. and T.C. both consistently reported that they did not want to return to mother's care.

*Appellant's Second Section 388 Petition; Mother's First section 388 Petition*

On August 19, 2020, appellant filed a second section 388 petition requesting reunification services or family maintenance services for S.E., stating he and S.E. had a close relationship.

On August 20, 2020, mother filed a section 388 petition requesting family maintenance services for all three children, stating that she continued to attend counseling and therapy.

The juvenile court set a hearing for both section 388 petitions to be heard on September 3, 2020, to be combined with the section 366.26 hearing.

*Appellant's Third Section 388 Petition*

On August 31, 2020, appellant filed a third section 388 petition requesting that the juvenile court change its order setting the section 366.26 hearing and requesting that reunification services or family maintenance services be ordered. In support of the petition, appellant alleged that he had engaged in ongoing therapy and demonstrated improved protective capacity to keep S.E. safe. Appellant's petition included attachments, primarily contesting the abuse allegations made by M.C. The petition stated appellant was attending regular therapy sessions with Zavala and attached the same letter from Zavala he attached to his first section 388 petition.

The juvenile court set a hearing on the petition for September 3, 2020, which was then rescheduled to September 10, 2020.

The agency filed a lengthy report recommending that the requests be denied. The report did note that, while the Court Appointed Special Advocate (CASA) recommended

11.

termination of mother's parental rights as to the children, the CASA recommended appellant's parental rights as to S.E. not be terminated based on his relationship with S.E. Instead, the CASA recommended that appellant be granted six months of family maintenance to show the juvenile court that he had "openly and proactively" remedied the concerns of his ability to adequately parent S.E. The agency, however, countered that S.E.'s relationship with appellant was similar to her relationship with the care providers; she was comfortable with both. Appellant insisted that there were no concerns of sexual abuse related to S.E. as she was his biological child and "it makes a world of difference."

*Section 388 Petitions and Section 366.26 Hearing*

At the September 10, 2020, combined section 388 and section 366.26 hearing, the juvenile court noted appellant filed a form MC-030 "declaration" the previous day, which consisted of attachments of various screen shots from cell phone texts, but no proof of service that other counsel had received it. Appellant stated he had "just dropped it in the box." The juvenile court struck the filing from the record.

County counsel objected to the attachments to the section 388 petitions on the grounds of hearsay and asked that those attachments be struck from the record. The juvenile court granted counsel's request but stated it would reconsider admissibility if a foundation for those could be laid.

The juvenile court noted that, at a conference in chambers, it had been agreed that all evidence presented would be considered for both the section 388 petitions and the section 366.26 hearing.

After being advised by counsel of his ability to assert his Fifth Amendment rights, appellant testified that he was facing eight felony criminal charges, including sodomy, terrorist threats and rape since November of 2019. While appellant acknowledged that the sexual abuse allegations had been found true by the juvenile court when he submitted on the matter, he stated he did not understand at the time that that could occur without contest and, if he had to do it over, he would have contested the allegations.

12.

Appellant testified that Zavala, whom he had seen weekly since May 2019, had completed a psychosexual analysis and had discussed inappropriate conduct involving children with him. Appellant testified that he did not know what "therapy for sex offenders" was. He asserted his Fifth Amendment rights when asked if he had ever acknowledged to Zavala that he had sexually abused a child.

Appellant testified as to his relationship with S.E. and said he had lived with the child since birth; mother was the primary caregiver while appellant was at work, but he spent most of his time with her when he was at home; he had had good weekly visits with her; S.E. addressed appellant as "daddy"; appellant believed he had a strong bond with S.E., as S.E. was excited to see him and ran to him.

The juvenile court found that some of the evidence appellant wished to present predated the last court order appellant wished to have changed and did not constitute changed circumstances.

Appellant testified that he had prepared a safety plan for S.E., which consisted of communicating with S.E., keeping S.E. in therapy, and having family and friends available for S.E. to talk to. He requested family reunification services or family maintenance services.

Mother testified that she was the primary caregiver of the children prior to them being removed. She acknowledged having continued contact with M.C. over social media, even though she was not authorized to do so.

Following argument by the parties, the juvenile court stated that it had reviewed all the section 388 petitions and there was no information that would support a finding of changed circumstances. As to mother, the juvenile court specifically noted her failure to follow court orders.

As to appellant, the juvenile court noted that he had signed a "Waiver of Rights Juvenile Dependency" document on February 4, 2019, in which he submitted on the allegation of his sexual abuse of M.C. The juvenile court noted that appellant had never

acknowledged that there had been any inappropriate contact or sexual abuse during appellant's therapy sessions with Zavala. As such, the issue of sexual abuse, which was an issue which first brought appellant before the juvenile court, was never addressed, and therefore changed circumstances did not exist.

After counsel provided argument for the selection and implementation portion of the hearing, and regarding the agency's recommendation of adoption, appellant's counsel argued that the close bond between appellant and S.E. was sufficient to find the parent child relationship exception to adoption.

The juvenile court noted the children's adoptability and, specifically, that the evidence of S.E.'s relationship with appellant was not a unique one in relation to S.E.'s relationship with her caregivers and others. The juvenile court denied the section 388 petitions, found the children adoptable, and a permanent plan of adoption ordered for the children. Appellant and mother's parental rights were terminated.

## DISCUSSION

### I.    INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant argues his trial counsel was ineffective by not objecting to the uncorroborated hearsay evidence of sexual abuse at the section 387 hearing; by not authenticating therapist Zavala's letter at the combined section 388 and 366.26 hearings; and by not calling Zavala and the CASA to testify at the combined section 388 and 366.26 hearings. We find no prejudicial error

*Background to Appellant's Claims*

Appellant contends counsel was ineffective for failing to object to uncorroborated hearsay evidence of sexual abuse at the section 387 hearing.

Appellant next contends that, by not authenticating a letter written by Zavala to appellant's counsel and attached to his section 388 petition, counsel's representation fell below an objective standard of reasonableness. In the April 21, 2020, letter from Zavala, Zavala refuted much of what the social worker had reported and testified to concerning

14.

Zavala's sessions with appellant. Zavala insisted that appellant consistently denied any type of inappropriate sexual contact with M.C. Zavala also insisted he never said appellant would benefit from an offender's program. According to Zavala, appellant did not qualify for such a program, as he had no history of sexual offense convictions and he denied all allegations against him. Zavala reported there had been no focus on behavioral changes in their sessions as there were no identified inappropriate behaviors of appellant that needed changing. Appellant argues that authenticating this letter would show that he was not inconsistent in his testimony.

As to the section 366.26 hearing, appellant contends that authenticating the Zavala letter would have offered further evidence to support his position regarding appellant's bond with S.E., as the letter highlighted that appellant brought S.E. to several of his therapy appointments and his interactions with her were always appropriate. Zavala had opined that S.E. felt safe in appellant's care and the two seemed to have a very strong bond and healthy attachment, and that appellant displayed genuine concern for S.E.'s health and well-being. Zavala stated further that he had no concerns regarding appellant spending time with S.E. and that it was extremely unlikely he would engage in any deviant or harmful behaviors toward her.

Appellant also contends counsel was ineffective for failing to call Zavala and the CASA as witnesses, as the CASA had observed appellant and S.E. for over 16 months and felt that appellant's parental rights to S.E. should not be terminated, but that appellant be given six months of reunification services.

*Ineffective Assistance of Counsel*

"All parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." (§ 317.5, subd .(a).) The test for showing ineffective assistance of counsel in dependency proceedings is the same test used in criminal proceedings. (See *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1667-1668; see also *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.) To prevail on his claim of ineffective

15.

assistance of counsel, appellant must show both that "(1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1146–1147.) " ' "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of adequate professional assistance." ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 954.) A reviewing court may reverse on the ground of inadequate assistance on direct appeal only if the record affirmatively discloses no rational purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437; *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1.)

To establish prejudice, appellant must show that there is a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for counsel's unprofessional errors. (*People v. Montoya, supra,* 149 Cal.App.4th at p. 1147; see also *In re Kristin H., supra,* 46 Cal.App.4th at p. 1668.) Appellant must prove prejudice as a demonstrable reality, not merely by speculation as to the effect of counsel's errors or omissions. (*People v. Williams* (1988) 44 Cal.3d 883, 937.) A court " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by [appellant] as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ..., that course should be followed.' " (*In re Elizabeth G.* (2001) 88 Cal.App.4th 496, 503; see also *In re Nada R., supra,* 89 Cal.App.4th at p. 1180.)

Taking the latter approach, we find that the record shows no reasonable probability that appellant would have had a better outcome had his attorney objected to the hearsay evidence of sexual abuse at the section 387 hearing, or had Zavala's letter been authenticated or had the testimony of Zavala or the CASA been presented at the combined section 388 or 366.26 hearings. Appellant cannot demonstrate that he was prejudiced by his counsel's performance.

*Section 387 Hearing*

We agree with respondent that the time for appealing the jurisdictional and dispositional findings from the section 387 petition has passed. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811 ["challenge to the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed."]) We address the issue on the merits nonetheless as appellant argues he received ineffective assistance of counsel at the time.

Section 387 provides a more detailed procedure where the order sought will change or modify an earlier order by "removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution ...." (§ 387, subd. (a).) Section 387, subdivision (b), provides that "[t]he supplemental petition shall be filed by the social worker in the original matter and shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child …."

Prior to filing the section 387 supplemental petition, the agency had attempted to make an in-home contact with appellant, who refused to allow the social workers into his home. The agency had also received new details M.C. had reported of appellant sexually abusing her, beginning when she was seven or eight years old and continuing until 2018. M.C. relayed that appellant had made threats against her and the family if she told anyone of the abuse. M.C. stated that, after she disclosed this to her mother and grandmother, her mother told appellant, and he cut M.C. with a knife on her arm. M.C. expressed concern for S.E. in appellant's care, as she was unable to talk and defend herself and he allowed her to "run around naked in the house." When mother was contacted about the additional allegations, she described them as "bullshit" and stated she did not know or want to comment on whether they were true, as she did not want the children removed from her care.

At the detention hearing October 16, 2019, the juvenile court found that a prima facie showing had been made that the prior disposition for S.E. had been ineffective in protecting her and removed her from appellant's care but allowed her to remain in mother's care. Prior to the contested hearing held January 29 and 30, 2020, the agency filed an addendum report in which it reported that S.E.'s counselor reported inappropriate comments by appellant, appellant not allowing S.E. to speak, and appellant's concern about mother rather than focusing on S.E. The counselor was worried that appellant was trying to put thoughts into S.E.'s mind and control the situation. Attached to the addendum report were documents from social services in Missouri, in which appellant's family and mother's family all had concerns about appellant.

The juvenile court found the section 387 petitions true and found, by clear and convincing evidence, that continuing S.E. in appellant's home put the child at substantial risk of harm.

Appellant contends counsel should have objected to this uncorroborated hearsay evidence and, because this evidence was the only evidence of sexual abuse, his failure to do so was prejudicial. We disagree.

"Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence." (§ 355, subd. (a).) Social worker reports and hearsay evidence contained in them are "admissible and constitute[ ] competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based." (*Id.* at subd. (b).) Nevertheless, if "a party to the jurisdictional hearing raises a timely objection to the admission of specific hearsay evidence contained in a social study, the specific hearsay evidence shall not be sufficient by itself to support a jurisdictional finding or any ultimate fact upon which a jurisdictional finding is based," absent certain exceptions, including that the hearsay declarant is available for cross-examination. (*Id.* at subd. (c)(1).) Although section 355 limits " 'the extent to which ... social study hearsay evidence can be

relied on exclusively, there is no limitation, except for fraud, deceit, or undue influence, on the admission of hearsay evidence.' " (*In re B.D.* (2007) 156 Cal.App.4th 975, 983.)

Thus, a section 355 objection does not render hearsay statements in a social worker's report *inadmissible*. (*In re B.D., supra,* 156 Cal.App.4th at pp. 980–981, 984.) Rather, "corroborating evidence ... which ... support[s] the witnesses' hearsay statements sufficiently to sustain a jurisdictional finding" also must exist. (*Id.* at p. 984 [section 355 objection "meant that uncorroborated, the [children's] hearsay statements did not constitute substantial evidence and could not be used as the exclusive basis for finding jurisdiction under section 300."].) Corroborating evidence is that "which supports a logical and reasonable inference that the act described in the hearsay statement occurred." (*Ibid.*)

The court in *In re B.D., supra,* 156 Cal.App.4th at page 984, has analogized "the quantum of corroboration necessary to support a jurisdictional finding after a section 355, subdivision (c)(1) objection" "to the rule in criminal law requiring independent corroborative proof of accomplice testimony." The court reasoned "this to be an appropriate analogy, because as with the objected to hearsay in a social worker's report, the corroboration requirement of accomplice testimony relates to the sufficiency of the evidence, not its admissibility." (*Ibid.* [citing *People v. Riel* (2000) 22 Cal.4th 1153, 1190; *In re Lucero L.* (2000) 22 Cal.4th 1227, 1244].)

In that context,

> " '[c]orroborative evidence, direct or circumstantial, is sufficient if it tends to connect defendant with the crime even though it is slight and entitled, when standing by itself, to but little consideration [citations], nor does it need to establish the precise facts testified to by the accomplice. It is sufficient if it tends to connect the accused with the commission of the offense, and defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense

19.

charged. [Citations.] [¶] Moreover, defendant's own testimony and inferences therefrom, as well as the inferences from the circumstances surrounding the entire transaction, may be sufficient corroborative testimony. [Citations.] False or misleading statements to authorities may constitute corroborating evidence or as part of circumstances supportive of corroboration [citation], and "[a]lthough it has been said that corroboration is not sufficient where the circumstances are consistent with the innocence of the accused [citations], the more recent decisions have held that whether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact [citations]." [Citation.]' " (*In re B.D., supra,* 156 Cal.App.4th at pp. 984–985.)

The independent corroborating evidence here can be garnered from the following. Appellant testified at the January 2020, hearing denying sexual abuse had occurred in the home. But he did acknowledge that he took M.C.'s bedroom door off the hinges and was unconcerned about her lack of privacy. According to appellant, after mother informed him in 2018 that M.C. made allegations of sexual abuse against him, he was never alone with her to avoid any further allegations. He also intimated he had done nothing wrong as he was never contacted by law enforcement or CPS about those allegations.

Mother testified that she did not believe M.C. regarding the sexual abuse allegations made against appellant, no agencies were contacted to investigate, and both M.C. and appellant lived in the home, although mother acknowledged that she did not allow appellant to be alone with M.C.

Maternal grandmother testified that M.C. had disclosed to her that appellant had sodomized her. When she told M.C. that she needed to be seen by a doctor, M.C. became extremely upset and stated she had made it up.

Most importantly, at the contested hearing held February 7, 2019, on the original section 300 petition, in which sexual abuse of M.C. was a major factor in initially detaining the children, appellant and mother submitted on the issue of jurisdiction. Counsel for appellant submitted a waiver of rights form, signed by appellant on February 4, 2019. The juvenile court questioned appellant about the form, and appellant stated he

had read it, he understood it, and he had gone over it with counsel. Thus, appellant himself admitted the sexual abuse allegations.

The juvenile court had ample evidence to consider the ongoing risk to S.E. of sexual abuse, and to find the allegations of the supplemental petition true and find, by clear and convincing evidence, that placement of S.E. out of the home was appropriate.

*Section 388 Petition*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both ' "a legitimate change of circumstances" ' and that undoing the prior order would be in the best interest of the child. [Citation.] The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959–960.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Given the evidence that appellant repeatedly sexually abused a child in his home, that he submitted on allegations of sexual abuse, and that he never engaged in treatment to address that fact, appellant had little probability of convincing the court that changed circumstances had occurred and that providing him with family reunification or family maintenance services would be in S.E.'s best interests.

The evidence that appellant wished counsel to highlight consisted of the opinion of the CASA and of Zavala, both expressing favorable observations of appellant's interactions with S.E. However, these opinions were made by the CASA based on monthly meetings, which since March of 2020 had been via telephone or virtually, and by

21.

Zavala, who, in his letter dated April 21, 2020, observed that he had seen appellant and S.E. together on "several occasions." Any weight given to these observations would be slight, in contrast to the social worker, the child's therapist, and the child's counsel, who all believed it would not benefit the child for appellant to receive additional services or be returned to appellant's care.

Thus, appellant has not demonstrated prejudicial ineffectiveness of counsel from the fact that counsel failed to produce the testimony of Zavala and the CASA in support of the section 388 petition. (See *In re Kristin H., supra,* 46 Cal.App.4th at p. 1668.) Accordingly, reversal is not required.

### Section 366.26 Hearing

Appellant also contends ineffective assistance of counsel led to the juvenile court's finding that the beneficial parental relationship exception to termination of his parental rights under section 366.26, subdivision (c)(1)(B)(i) did not apply. We find substantial evidence to support the juvenile court's finding and therefore disagree.

After reunification services are terminated, "the focus shifts to the needs of the child for permanency and stability." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) In general, if a child is adoptable at this point in the proceedings, the juvenile court must terminate parental rights. (§ 366.26, subds. (b)(1) & (c)(1).) This rule, however, is subject to several statutory exceptions (§ 366.26, subds. (c)(1)(A) & (c)(1)(B)(i)-(vi)), including the beneficial parental relationship exception, which applies when "termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial,

positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' " (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234–1235.)

" '[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt.' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) " 'A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree*, but that does not meet the child's need for a parent.' " (*Id.* at p. 937.)

"The parent contesting the termination of parental rights bears the burden of showing both regular visitation and contact and the benefit to the child in maintaining the parent-child relationship." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80–81.)

With regard to the court's conclusion a parent did not meet his or her burden of proof with regard to any factual findings, we look to "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647.) The question is "whether the ... evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We review the court's conclusion that the benefit S.E. would receive from continuing the relationship with appellant was outweighed by the benefit she would receive by being adopted for abuse of discretion, and any factual findings that underlie it for substantial evidence. (See *In re Breanna S., supra,* 8

Cal.App.5th at p. 647.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M., supra,* 7 Cal.4th at pp. 318–319.)**4**

We assume, without deciding, that appellant maintained regular visitation with S.E. and concentrate our analysis on whether S.E. would benefit from continuing the relationship with appellant. (§ 366.26, subd. (c)(1)(B)(i).)

Appellant argues that his own testimony regarding his bond with S.E., and the favorable statements of Zavala and the CASA, which counsel failed to introduce, adequately support the parent-child relationship exception.

However, the social worker determined that the relationship, when viewed from S.E.'s perspective, was not central to her well-being and that severing that relationship would not be detrimental to her. In determining whether the relationship between parent and child is beneficial, the court looks to such factors as the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative effect of

---

**4** Appellate courts have adopted differing standards of review for the beneficial parent-child relationship exception: substantial evidence (see, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165); abuse of discretion (see, e.g., *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449); and, more recently, a "hybrid" standard, which reviews the juvenile court's factual findings (e.g., whether the parents regularly and consistently visited and whether a beneficial parent-child relationship existed) for substantial evidence, and a juvenile court's conclusion that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption for abuse of discretion (see, e.g., *In re Breanna S., supra,* 8 Cal.App.5th at p. 647).

The issue is currently pending before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839. We note there is not much practical difference between the different standards of review. Under any of these standards of review, the practical differences between them are slight because they all give broad deference to the juvenile court's judgment. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We should interfere only if under all the evidence viewed most favorably in support of the juvenile court's action, it finds no judge could reasonably have made the order. (*Ibid.*) We note we find no error under any of them.

interaction between the parent and child, and the child's particular needs. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

S.E. is still very young and has spent a substantial portion of her life in foster care. While she expressed that she wanted to be with appellant, she also expressed that she wanted to stay in her current placement and that she wanted to go home with agency personnel. S.E. had no issue with being left alone with her counselor; she had no issue when she asked to go home with appellant but was not able to; and she was easily distracted from appellant when leaving visits, even when appellant prolonged his leaving. During S.E.'s first year of life, mother was her primary caregiver. Since her initial removal from appellant and mother's custody, she had spent all but seven weeks during one year and eight months of the dependency in someone else's care.

Appellant contends S.E. is bonded with him, as evidenced by her pleasant visits with him. He contends counsel should have also called Zavala and the CASA to support this contention, as they both reported seeing appellant and S.E. interacting affectionately and appropriately. That, however, is not the standard. Rather, the juvenile court must look at whether the child is bonded to appellant, and then it must weigh that bond (if any) against the benefit of adoption by prospective adoptive parents.

While the relationship between S.E. and appellant was, at times, positive, with S.E. enjoying her time and wanting to spend more time with appellant, the same was true with others S.E. spent time and interacted with. There was no evidence that S.E. would be harmed, much less "greatly harmed," by termination of parental rights. While S.E. may have had a pleasant relationship with appellant, she also had a similar relationship with her caregivers. The bond between S.E. and appellant was not so significant that permanently severing it would greatly harm S.E.

Appellant simply did not meet his burden to show that the bond between him and the child was so strong and beneficial to the child that it outweighed the benefit the child would receive from having a stable, adoptive home. Despite the evidence that S.E. was

25.

happy to see appellant during visits, the evidence simply is not enough to establish that S.E. was so bonded with appellant that it would be in her best interest to forego the benefits of adoption.

In sum, the juvenile court did not abuse its discretion in determining that the best interest of S.E. would be better served by the permanency and stability proffered by a prospective adoptive home and in finding that the parent-child relationship exception to termination of parental rights did not apply.

**DISPOSITION**

The orders of the juvenile court are affirmed.